Good afternoon. May I please the court? My name is Steve Sugarman. I'm counsel for Plaintiff's Appellants in this matter. And I'll be referring throughout my argument this afternoon to the Plaintiff's Appellants collectively as Forest Conservation Cnsl or FCC. The acoustics are strange up here. I will agree. I've never been here before. And I have a tendency, the opposite problem that other people have, I tend to yell. And so if you need me to tone it down, tell me to be a little quiet, and I'll oblige. In this case, Your Honor, Forest Conservation Cnsl, FCC, alleges that the Forest Service failed to comply with its procedural and substantive duties under the National Forest Management Act, NFMA, and with its procedural duties. What they allege is we're past that, isn't it? This is a motion for summary judgment, isn't it? That is correct, Your Honor. What does the allegation have to do with it? What is the allegation? I mean, what you're looking at is proof. We were at – when we went to – when we were before the Court, what we did is we presented evidence. It's the – You're on the right track. Okay. Well, I mean, it's a very interesting procedural posture. And the procedural posture of this case is very important to the Court's resolution of the appeal. When we were before the trial court, in order to make out our prima facie case, what we did was we argued that the economic analysis that was prepared at the timber sale level or the site-specific level was inadequate to comply with the provisions of the National Forest Management Act. The Forest Service took the position that it did not need to comply with the specific prescriptive and economic analysis requirements of the National Forest Management Act, so that, therefore, there really wasn't any need to get to the issue of adequacy of the analysis. The question has become, Judge Bea— I don't think that's quite precisely the position the government took. The position the government took was that they did comply with the National Forest Management Act because they evaluated or monetized that horrible phrase. It's a horrible word. They monetized the non-timber resources at the land resource management plan level rather than at the individual timber sales level. Is that correct? That is correct, Your Honor. And that is the precise legal issue that this appeal presents to the Court. Does the obligation that is created by Part 219 apply at the site-specific level, or does it only apply at the forest plan level? In the case that we have here before the Court, the forest plans were developed a decade or more ago. And the Forest Service is saying, we don't really need to do—we're not legally— Counsel, it looks to me as though the law on it isn't that confusing, really, if I've read it right. And I may not have because it's so complex, so you'll educate me. But if I understood it right, under NEPA, the Forest Service does not have to assign a money value to the recreational uses at issue. Under the Forest Management Act, the Forest Service does have to assign a money value where reasonable, but qualitative criteria can be used when monetary values cannot be reasonably assigned. And the Forest Service does not have to use a monetary value in the project-specific plans as opposed to the overall plan. So it looks like they just—that's what they did. Your expert witnesses think that's not reasonable. They should have used a monetary value. Their expert witnesses think it's really not reasonable to use a monetary value for non-monetary things, and a qualitative is good enough. And all you can do that's really supportable. What am I missing there? Your Honor, respectfully, what you're missing is the fact that 219.12, which is the regulation that opposes an affirmative obligation on the forest to assign a monetary value when such a monetary value can be reasonably assigned, applies at the site-specific level as well as at the forest level. And that is really the dispute here before the Court. That's the question before the Court. Let's say we go with you that far. It still has that qualification when a monetary value can reasonably be assigned. Right. And we have the experts in disagreement about whether a monetary value can really be assigned. Again, Your Honor, that's not correct. Again, and I'm glad that we're on this because the issue of deference is obviously of critical importance here. If this were a case where there was a disagreement about a technical or a scientific or a complex matter that were within the particular expertise of the Forest Service, for instance, whether a value- Even if it's not. Let's say it's not. Let's say it's- So you have an economist who gets on and say, you can give a reasonable monetary value to the pleasure and beauty of sea kayaking in the inside passage in view of the Tongass. I would put $850 per sea kayak trip on it. And somebody who disagrees says the beauty and the pleasure and the exalted feeling that you get from sea kayaking in the inside passage within view of the Tongass is something that's priceless. Literally. It does not have a price. There is no monetary value that can reasonably be assigned. On what basis could we say that it's an abuse of discretion to go with the second view rather than the first? I am not here arguing that you should. And actually, to be perfectly frank, it would be an uphill battle for me to make such an argument. But that's not the case that's before the Court today. The case before the Court, in the case before the Court, the Forest Service acknowledges that they could have assigned a monetary value to various resources that are in the timber sale area, but that they did not. Okay. How much is a sea kayak in Fort Worth? That is a – that would be an issue that would be within the expertise of the Forest Service. And that is a valuation. That is a – How can the Forest Service tell me what it's worth to me? The Forest Service can't tell you what it's worth to you. But the Forest Service can tell you what it's worth on average, or they can tell you what – I don't see how they can. I've seen lots of people, and I've been one of them, getting into sea kayaks around Valdez. And we all went back and told our friends how wonderful it is. How can you say what it's worth to any of us? There are various methodologies, Your Honor, that the Forest Service uses. And, in fact, the Forest Service is one of the leading research shops for the determination of nonmarket values. The Forest Service has made a routine business of assigning market values to nonmarket resources. Can I just – I want to make sure that we're all talking about the same law here. You're talking about the regulation 219.12 that goes back to 1982? That's correct, Your Honor. Okay. And what is the passage in that regulation? Judge Schroeder, I'm talking about 219.12G3l2. Oh, wait a minute. D? G. I know. I'm trying to find it. Okay. It begins – G begins with estimated effects of alternatives. Wait a minute. Your Honor, you're sure you have the 1982 compilation? I'd be happy to give you mine, which is highlighted, without any annotations at all other than the highlighting, if that would assist the Court. It says the expected real dollar value of all outputs attributable to each alternative to the extent – this goes to what Mr. Clampitt was talking about – to the extent that monetary values can be assigned to non-market goods and services using quantitative and qualitative criteria where monetary values may not reasonably be assigned. That's correct, Judge Bea. And in this case – And that is speaking to which phase? That applies to both the forest plan and the site-specific plan. The government's position in this case is that, Judge Bea, that various – that market values can be assigned to many of the resources within the timber sale areas. But they didn't do that because, in their position, the obligations that are imposed by 219.12 only apply at the plan level. Well, the 219.12 is entitled forest planning process. Yes, Your Honor. And then it says that the preparation or significant amendment of a forest plan and all the rest of these things appear to be relating to that. So that's what I'm not – Yes, Your Honor. This is a – again, that – what we're on right now is the very narrow legal question that's actually before the Court, which is, does 219.12 apply at the site-specific level as well as the plan level? That's what I'm trying to figure out. Where does it? And this Court has previously addressed that question in a number of cases. The question – Well, I'm just looking at the reg. Right. I'm trying to figure out from the language of the reg what language you're relying on. I'll tell you how the Ninth Circuit resolved this. No, I – The reg – I'll say, there is nowhere in the regulations that say these regulations apply at the site-specific level. What the Ninth Circuit has determined, as well as the Eleventh Circuit and the Tenth Circuit, is that planning is an iterative process, that forest planning is dynamic and that it's ongoing, and that the regulations in 219.1 refer not only to the development of a forest plan, but to the maintenance and the revision of a forest plan. They also have said at 219.3 that the regulations that are incorporated into Part 219 apply at the planning level. In the case of Inland Empire Public Lands Council, this Court looked at the regulation 219.1, 219.3, and determined, well, a site-specific project is within the planning area, and that accordingly, the regulations at Part 219 do apply at the site-specific level, as well as at the forest level. Let me bounce you over to the other half of that regulation. The other half being – I want you to look at 219.12E13, the phrase there that says, those major outputs that have an established market price. Now, logs have an established market price. Exalted aesthetic experience, I don't think it has an established market price. You can't find it on eBay. That – you're right, Your Honor. You're right to the extent that logs have an established market price. You are incorrect when you say that recreation or water or wildlife does not have an established market price. If I type Roloflex 2.8F, 2.8 Planar F model into Google, I will get a whole listing of what that camera sells for. If I type exalted aesthetic experience into Google, I won't get a single dollar value. Your Honor, if you had a search engine of all United States Forest Service publications, and you typed into that search engine, recreation economic value, you would come up with an amount, and it would be $110 billion. At least that's the amount that's in the record. What I will get as an economic value is how much people can make by selling rafting trips, renting sea kayaks in those locations where that's available. Now, there are many exalted aesthetic experiences where they can't, and that is only connected to the exalted aesthetic experience. It isn't the exalted aesthetic experience. For example, if you drive from Fairbanks to Wiseman on the Dalton Highway, you will have numerous exalted aesthetic experiences, but there's nobody to pay a fee to. So it won't be in any of the accumulations of data on the price of recreation. Your Honor, it's interesting, but you, Your Honor, are now disagreeing with the Forest Service here, which has acknowledged in this case that it does have the facility to determine a monetary value. I don't have to take everything the Forest Service concedes as being established. They're not an Article III court. It's for us to read those major outputs that have an established market price. There may be some areas where we defer under Chevron, but it's not necessarily so that we would have to defer on this. And I just want some help here. How do I give the exalted aesthetic experience an established market price? How do I look up the market? What you do is you would go to the excerpts of record, and you would look at the various Forest Service publications that we've cited in the excerpts of record, and the Forest Service there would set out the methodology that it itself uses to determine the market value, and you would apply that methodology. Now, Your Honor, you might disagree that the methodology actually captures the market value or the monetary value of that particular resource, but that is how Forest Service economists do that job. Are you talking there about how much money people marketing the recreational uses make, like all the hotels around Mount McKinley Park or Denali Park, or are you talking about putting a price on the exalted aesthetic experience? The Forest Service goes about it two ways. They use a travel cost method, which is akin to the methodology that you're talking about, and they use the contingent valuation methodology method, which takes into account a consumer surplus, which tends to be higher than the travel cost method. But, again, I feel- The second method, that really gets at what I'm talking about. The amount that you pay plus your consumer surplus equals the value of your exalted aesthetic experience to you. How do they put a number on it? Presumably, Your Honor, and, again, I can't emphasize this one point enough. Presumably, you think that the consumer surplus, if I may, method, a method that takes into account the consumer surplus, is going to result in an elevated monetary value. I'm not taking it in a Marshallian sense. It's the marginal. It's where the curves meet. I understand that. However, again, the essential point here is that the Forest Service itself acknowledges that it can determine monetary values, but that it did not do so in timber sale planning because the 219.12 regulations do not apply at the site-specific level. And that would appear to be borne out by the heading of the red. You say, well, we haven't applied it that way. We have said it does apply. There has to be another, a site-specific monetary value put on these things here. And you- You haven't said that, Your Honor, to be fair. You've said that the Part 219 regulations apply at the site-specific level. Not that we haven't looked at 219.12 specifically in the Ninth Circuit. The language of the red doesn't appear to apply site-specifically. Now, are you saying that we have applied it site-specifically? I'm saying that the Court has determined that the analysis requirements of the Part 219 regulations have been applied in numerous cases by the Ninth Circuit to the site-specific level. The Ninth Circuit has held- In addition to the- Forest plan level. To the forest plan. And the reason for that, Your Honor- Well, no. You're relying on the- There's a couple of cases. The cases are Inland Empire Public Lands Council, where this Court said 88F3rd 757, both stages, must fully comply with the NIFMA's regulations. What page are you- That's 88F3rd 757, Your Honor. And more recently, in Citizens for Better Forestry, this Court said that the NIFMA regulations set broad guidelines to be followed when preparing regional and site-specific plans. That's 341F3rd at 965. That just says the regulations apply. Yes, they have said that the regulations apply at the site-specific level. And there's an important reason for that. The reason is that forest plans are developed, maintained, and revised. There is an iterative process. There's a feedback loop between forest planning and between site-specific planning, and that is visually depicted in the reply memorandum that I have submitted to the Court. Without current information on market demand, current conditions, relative values that is set forth in a project-level analysis, the whole planning scheme that is contemplated by NIFMA falls apart. It looks like what you're talking about, the issues in our case, were not even raised in Inland Empire. You're just drawing inferences from the general discussion. I'm drawing – in Inland Empire, the regulation, the issue was 219.19, which dealt with the analysis requirements for biodiversity on a national forest. The Forest Service, just like it does in this case, argued in Inland Empire, we don't need to do that. I want the keys. Pardon? The Forest Service won. The Forest Service lost on that issue, Your Honor. In Inland Empire, the Forest Service – this Court squarely repudiated the Forest Service's position and held that the regulations do apply at the site-specific level. What's the site of the – I think we've got a whole bunch of cases all at the same time. I'm sorry. The Inland Empire site is – I just have a page site here, Your Honor. Oh, it's 88 F3rd 754. And on this issue, I would direct the Court to footnote 6, where the Court says the Forest Service has argued as a threshold matter that these regulations don't apply at the forest level, and this Court disagreed. And then – so that's footnote 6, and then again at page 757. Probably the – other than the Inland Empire case, the most cogent analysis of the application and the importance of the application of the 219 regs at the site-specific level is in an 11th Circuit case, which is called Sierra Club v. Martin, and that's at 168 F3rd 1. And I would also note that – It looks like that footnote 6 that you're talking about wasn't addressing itself to which plan so much as what geographic area. Exactly. It was the Forest Service's position in that case that the Part 219 regulations only apply at the landscape level and not at the site-specific level. And this Court determined, no, the regulations apply to the site-specific level as well as to the landscape level. Okay. We've more than used your time. Thank you, Your Honor. We'll give you a minute on rebuttal. Thank you. No more. Good afternoon. May it please the Court. I'm Lisa Jones from the Department of Justice for the Forest Service. I should probably go right to the NIFMA cases about the Part 219 regulations, and I will just do that. Actually, I argued the Inland Empire case and wrote the Inland Empire brief, so I kind of have an unfair advantage in knowing what we were arguing, and we were focusing on the Part 219-19 regulations. And our position at that time was that they applied at the forest plan level to the extent the forest plan indicated, such as the forest plan in the Eleventh Circuit case, which my opponent noted, the Sierra Club v. Martin case. If they required that inventory data be collected at the project level, then it needed to be collected at the project level. But the Inland Empire case addressed one particular regulation in the Part 219 regulations, 219-19, which this Court interpreted a provision within 219-19 that said project area, and it looked back and said that project area can, in fact, be a planning area. And this Court said that that planning area, for purposes of that regulation, can be a project area. I think that it would be a jump to apply that reasoning to 219-12, which expressly addresses the preparation of a forest plan and how the Forest Service should go about preparing a forest plan. So it's our position that to the extent that this Court says more than what the Court actually says outside of the footnote in Inland, which is, yeah, the Forest Service does its planning at two levels. It creates a forest plan. It has to consider its regulations in doing so. And at the project level, the project has to be consistent with that plan, and that's how you get at are you being consistent with the regulations. That's what's said in the body of Inland Empire, and that's what's said in the Sierra Club v. Martin case as well, that if those cases interpreting other portions of the regulations are found to hold more than that, they certainly don't govern 219-12, which is preparing forest plans. That said, I'd like to take a step back, because we were talking a lot about monetizing and whether to monetize, whether not to monetize. What's the Forest Service's position on this? Our position is that as a threshold matter, there is one issue involved in this case, and that is Forest Conservation Council's position that the Forest Service must conduct its economic balancing of how best to maximize long-term net public benefits at the project level, and it cannot comply with NFMORG's implementing regulations by doing so at the plan level. The Forest Service's position is that under NFMA and under the implementing regulations that it's set forth exactly how it should do that, and every place you find a reference to net public benefits, maximizing those benefits, it's within the regulations describing preparing your forest plan. There's no plain language in the statute or in the regulations that require this to be done at the project level, and the Forest Service's interpretation that it should do this economic balancing of all resources, how best to provide for multiple use and sustained yield, which itself means over a long period of time, is to do so at the plan level, and it did so here. It's very misleading to suggest that the Forest Service didn't do any of this. The Forest Service did it, and of course the Forest Service retains the discretion if it feels that there has been some change of circumstances, new data, something that would require more to be done at the project level. These project analyses said we could go back and do this, but here we don't think we need to. That's how their administrative appeals were resolved. And what's very clear to me is that this decision was arbitrary. I suppose it would be reviewable under the arbitrary and capricious standard. It would be reviewable, but the interesting thing is my opponent is standing up here saying, oh, look, these were 1990 forest plans. Obviously they're outdated. They need to revise. They need to monitor. They need to amend. Well, they never brought a claim saying someone needed to amend a forest plan. They never brought any evidence to the court or to the Forest Service saying, hey, by the way, for these particular projects at issue, you didn't do this, that, this, or that. There is nothing in this record that shows that the Forest Service missed anything with respect to these projects. But what was their position in the administrative appeal? Their position in the administrative appeal is that there had to be this balancing done at the project level. And the Forest Service explained throughout the record, we did it at the plan level and we're not going to revisit it at this point. And they never gave any reason why they should. Yeah. Other than that's what they would prefer. 19, we're dealing with old regs. Are there new regs that have been promulgated since? There are new regulations. It's our position that the 82 regulations govern here because of when the project decisions were signed. The new regulations, they eliminate any discussion of them maximizing long-term net public benefits. But the new regulations, likewise, do not impose any obligations on the Forest Service to conduct this analysis at the project level. I'm trying to figure out how important this case is in the long run. Well, they would have new regulations supersede the old ones, and do they make clear anything here that was not clear under the old ones? They have less guidance to the Forest Service on economic and environmental balancing. There's not as much guidance as there are in the 82 regulations on that point. Could you explain to me something that's puzzling me? If the Forest Service can do the economic valuation of the net public benefit through modernization, through their expert witnesses, at the plan level, why is your position that they cannot do it at the project level or they just don't have to do it? Well, there are two positions. One is that the Forest Service doesn't monetize every non-market resource and, in fact, monetize certain resources depending on the forest, depending on the information it had available, depending on the reliability of that information, depending upon other subjective means. And the Forest Service chooses its methodology based on the resources that it's looking at. It's kind of a forest-specific thing. So the Forest Service does, in some instances, monetize non-market values and, in other instances, says, you know what? If we did, we might not be giving them the consideration we should, so we need to put our thumb on the scale a different way, and we'll do so by, for instance, putting constraints on timber harvest and other things. And that's explained in each forest plan analysis. The Forest Service's position is the most meaningful way to look at what the statute and the regulation requires, which is a balancing of all forest resources to ensure that the Forest Service is providing multiple use and sustained yield in a manner that would maximize net long-term public benefits, which is defined as, you know, the benefits to the nation over time, that it should be doing this on a broad-scale basis as part of its forest planning process and modeling its alternatives. It uses what's called a four-plan model, and I would... Why can't it simply apply the figures that it has developed for the gross, which is the forest plan, and apply them to the acreage of the... Well, it does that at the plan level. What the forest plan does is it says, based on our balancing and how we've looked at these alternatives and how we've decided we can best meet our objectives in managing this forest, we're going to set aside these areas for no harvest, these areas for limited harvest, these areas for recreation. It sets out what's called management areas and different management prescriptions. And so the question for a project would be, are you consistent with these management prescriptions as established by the plan? Now, what Forest Conservation Council could have done is said, hey, not just as a legal matter, regardless of whether you have a brand-new forest plan or an old forest plan, you've got to do it again. You have to either redo your analysis. That's what they want. They want it done again. You can't just rely on your forest plan, but you've got to do it again in your project-level analysis. They could say, hey, we don't think that you balance things correctly at your forest plan level because this project shows that where you want to, what you're calling matrix, which is the area where typically timber activities occur, we think that's better as a winter cross-country ski area, and for these recreational reasons or other aesthetic reasons, you did it wrong. They didn't do that. They presented you with a pure legal question. They don't say something else should have happened. They don't challenge the assumptions. They don't challenge the prescriptions. They don't challenge the allocations. They want this court to ignore what happened at the forest plan level and just hold something that NFMA doesn't require, something the regulations don't require, which is do it again at the project level. And I'm certain that they believe that there are perceived benefits that would happen their way, but the question is, did Congress require it? No. That's the only question. And I guess the only other question would be. Whether it can be done. Right. Anything can be done as long as you want to spend enough tax money. Or whether the regulations that the agency had to promulgate. Right. I guess the question for this court would be, is what the Forest Service did plainly inconsistent? Because that's the only question. They didn't say, hey, for the Johnson Project, we gave you, we submitted to you Forest Service evidence that you did it wrong, you blew it, there's new data. They didn't do any of that. This record shows the project analyses that stand unless they should have redone the economic analyses and the forest plan analyses stand. And it's our position that the Forest Service has a reasonable interpretation of the National Forest Management Act and a permissible interpretation of its own regulations. And those interpretations are entitled to substantial deference. And its choice of methodology, it is a choice of methodology. Do we do this at the project level where we might only have two resources at issue? We might only have matrix land allocations at issue. And some other, you know, non-aesthetic resource at issue. Should we balance it there? Or should we do this in an overarching manner the way that we believe that the thrust and language of the statute and the regulations would require? Counsel? Well, as you know, I have some trouble with the methodology of putting values on non-economic goods. I'm trying to imagine concretely, well, on the one hand, there are the people with an interest in cutting, selling, purchasing lumber, people that want to move into houses that cost a little less money, that kind of thing. On the other hand, there are people that hike and people that bike and people that cross-country ski and they don't want to see bare spots on the hills. Hard for me to understand exactly how you put a number on the ladder. But if I understand what you're saying, the Forest Service does, in fact, put a number on the ladder. It just does it at the level of the entire project and not the specific site. It puts a dollar value on certain typically non-market resources. I mean, recreational resources. There are some economic means to try to evaluate what a person might pay per day to come and hike. And then they look at things like recreational fishing, keeping, you know, streams clean enough that they're stocked that fishermen would pay to come. They do different things. I think that in one of the forest plans trying to do that. Let's say you can do it, as opposed to just valuing what the recreation industry can get out of the forest, that you can value the recreation. I'm suggesting there's a distinction between valuing the recreation and valuing what the recreational industry can collect. Let's say you can do both and they do do both. Why not do it at the site-specific level? I'm not saying they have to, but if they can do it at the project level, what's the barrier to doing it at the site-specific level? What does it matter? Well, what they're directed to do under the statute and the regulations. I'm not asking you that now. I'm not asking you what they have to do. Why not do it? I'm asking you if they can do it, why not? What's the practical significance? I'm going to assume they can do it for all values. The practical significance in the Forest Service's view is that unless something has changed that would suggest that the allocation that it's already made at the plan level. Why not? It would just be redundant. I mean, you'd be either redoing the exact analysis you did or you'd be providing less information at that point. If you and your husband are in the kitchen and he says, get me a glass of water, you'd better have a reason why or else you're going to say, get your own glass of water. Well, not necessarily. It's not enough that you don't have to. I don't have to. It's not a good reason. Out of the kindness of my heart, I ultimately would just do it. I'm putting this. I mean it. No, I know. I know. I don't have to. That's right. Is an explanation of why you can't be compelled. It's not a good reason why you don't if it's no trouble. So I want to know if they can do it. Well, I don't know that I would say it's no trouble. Look, is there something that's theoretically easier about doing it at the project level than the site-specific level? Does it cost a whole lot of money? I don't know how much it costs. I mean, if you can do it at all, why not do it as a practical matter at the site-specific level? The Forest Service does not believe that it's meaningful to revisit it unless there's some good reason to go back and do it again. All you've told me so far is I don't feel like it. No. It has already assigned, it has already balanced for the purposes of the forest how best to maximize these 100 public minutes. Tongass National Forest is bigger than a lot of countries. That's true. The Tongass is very big. And actually, that's the sea level EIS probably did the most as far as going forward on that point. But really the question before this Court is do they have to? But why don't they as a practical matter is they can and they would under certain circumstances. Our legal question is do they have to? But it gets a whole lot easier to answer a legal question if you understand what as a practical matter they're talking about. And so far I don't fully understand what you're talking about. I mean, why not do it if you can do it? If it's cheap and you can do it, why not? I don't know that it's cheap. I don't know that it's expensive. I know that it's less meaningful because the Forest Service has already gone through an overarching process. They model. I would like to cite you to a decision of this Court that talks a bit about the modeling and doing this at the Forest Plan level, which is the Wilderness Society versus Tongass. It's 188 F3rd 1130. I think that would show you with respect to it was a grazing suitability determination and how the Forest Service balances economic and environmental considerations at the plan level and why it does so. It's an opportunity for the Forest Service to use this model to put in, okay, let's maximize non-market issues. Let's maximize timber. Let's do a mixture. Let's analyze these alternatives and see which one we think best meets the needs for this forest. And then they allocate the land that way so that when you have a project, your project is taking those things into account because it's only going to be cutting where it's been allocated to do that. It's going to be protective where the Forest Plan is telling it to be protective. But if something new came up, there was, you know, a group that came in and said, wait a minute, we want off-road vehicles in this area, and we don't want you to cut down the trees, or we think this is a bird sanctuary. I just haven't made myself clear. This was a softball question. I apologize. The idea of it is to find out, Your Honors, not only don't we have to, but there's a good reason why we don't, and here it is. I guess I'm not giving you a good enough reason, but the Forest Service believes that the more meaningful way to do it is the way it does it. Why is it more meaningful? Because it's getting the what the regulation asks for is maximizing long-term net public benefits of all resources, of all multiple uses, and making sure there's a sustained yield of the resource of certain resources. And that the best way for it to understand what multiple uses and what sustained yield over the long term should be maximized and how it's maximizing these benefits is at the plan level. Counsel, if I understand this system, the plan is there. It has a value for all these things. It says that only so much value should be cut, and these are the recreational values. Now, you have a specific authorization for a sale. I understand that that can be challenged. Is that correct? That's right. And if someone wants to challenge and say, is not consistent, is out of whack, it is not in accordance with the plan, that can happen. That can happen. And then whatever is decided in that can be reviewed by us on review of that decision. They could also, during the course of challenging that project, say, and, by the way, you got it wrong in the plan, too. Because, as you can see with this particular sale, That isn't what happened here. That's not what happened here. Instead, the contention is that under the statute that they have to do that again. Yes. Because the reason for doing it on the plan basis and not redoing it on the site-specific basis would be that on the plan basis, when you take into consideration all the sites, there can be a benefit to the public. But if you were to take one little site where there would be not a benefit to the public, then if you overruled that particular site development, it would harm the overall site. That's true. I wish that I had come up with that for Judge Kleinfeld. I'm running out of time. I just would ask the Court that it affirm the district court. And in our view, you don't even have to reach the monetization issue because we feel that the question of whether it needs to be done at the project level, which we think the statute and regulations answer in the negative, is sufficient to decide the case. Thank you. Thank you. Very briefly, if you want to. One minute. One minute. I have a couple of questions that he'd like to ask me. I urge the Court to review the reply brief. The reply brief is very clear with respect to the limited nature of a forest plan. It's important for the Court to realize that a forest plan does not make any resource commitments at all. It doesn't schedule any timber sales. What the forest plan is is a zoning ordinance. Here is what the Forest Service said in the brief to the Supreme Court in the Ohio Forestry Association case. It's one sentence. Even where a particular tract is designated as suited for timber production, both the Forest Service and the prospective purchasers will consider a variety of site-specific environmental and economic factors before any timber harvesting activities will actually occur. Economic values shift and change over time. That is why the Forest Service has been required by the Ninth Circuit, the Eleventh Circuit, and the Tenth Circuit to conduct ongoing and continuous analyses pursuant to the Part 219 regulations at the site-specific level. Thank you. Thank you, counsel. Very interesting case. I'm well-argued by both of you. Thank you. The case, as argued, is submitted for decision. That concludes our Court's calendar for this afternoon.
judges: Schroeder, Kleinfeld, Bea